Good morning. We have two appeals to rehear on bunk this morning. We will break after the first one to reconstitute the court. We'll be joining us for that argument. Counsel, we're familiar with your case. We've read your briefs, the authority cited in your briefs, the panel opinion and dissent. We're familiar with your case. You have limited time this morning so you don't have to give us the background. We know what the case is about. We're probably going to have some questions but feel free to get straight to the heart of your argument. Do be mindful of the traffic lights. When the red light shines, it is time to finish as Judge Edmondson used to say, please do not treat the red light as aspirational. If you're finishing a question from the court, though, of course, you can finish your answer. But do be mindful of our time. If you're on our time, you won't lose any rebuttal time if that's something available to you. So we'll begin this morning with Lange v. Houston County. Mr. Lange, please the court. Sergeant Lange alleges disparate treatment discrimination under Title VII, which requires proof of intentional discrimination against her. Here, the district court determined that Houston County's health plan is facially discriminatory. That was error for at least three reasons. First, the exclusion applies to all plan participants, male and female, transgender or not, and it excludes reversals of sex change operations as well as sex change surgery itself. Second, the plan draws a line between those who want sex change surgery and those who do not with transgender individuals on both sides of that line. And third, the plan covered Sergeant Lange's non-surgical care, including her endocrinologist visits, her hormones, and her psychologist visits. Expanding on these reasons, the plan's evenhandedness can be summed up like this. Lange is subject to the exclusions for sexual dysfunction drugs, bariatric surgery, and hearing aids, none of which she is known to need or desire, while cisgender participants are subject to the exclusion for sex change surgery, which they are not known to need or desire. All of the plan terms... Would the procedure be covered for another medical reason other than a sex change? In other words, a vaginoplasty by someone, a female, who was assigned female at birth. It's a little bit difficult to hear. I'm sorry, I'm struggling this morning. Is a vaginoplasty covered under the plan for a female who was assigned the sex of female at birth? Yes, under the plan there is a provision regarding reconstructive surgery. And so for a natal female, someone born female, where the procedure is designed to, or the purpose of the procedure is to reconstruct or fix something that's there, that surgery is covered. So does that mean that the exclusion cannot be applied without considering the employee's sex assigned at birth? No, Your Honor, that's not correct. The procedures are not comparable. A transgender procedure, according to plaintiff's own experts, would involve, for Sergeant Lang's situation, removing the penis, removing the testicles, shortening the urethra, and then creating, not reconstructing, but constructing a neo-vagina by inverting the penile and scrotal skin. None of that would be necessary or even anatomically possible for a natal female who is getting a traditional vaginoplasty. Can I ask you a question? Even setting aside the comparability or incomparability of the procedures, why wouldn't the exclusion likewise apply to a natal female who transitions to male and then wants to de-transition to female? Your Honor, the exclusion covers any sort of sex change surgery, regardless of whether the person is natal male or natal female. And I think to your question, it also covers the reversal. So it's not trying to enforce the exclusion. Right, the exclusion covers the reversal as it covers the transition. It covers the de-transition as well, correct? The exclusion applies to the reversal as well. Natal female, natal female. That's right. So let's suppose you have a woman who gets breast augmentation surgery, excuse me, and then because of complications, let's say an infection, she wants to remove the breast, the breasts, right? That procedure would be covered, wouldn't it? Your Honor, the record isn't developed. I mean, assuming no other exclusion applies, that would be covered under the sex change, despite the sex change exclusion, right? The record isn't developed on a scenario just like that. Well, right. Well, this is a hypothetical. So, but I mean, the sex change exclusion would not prevent that surgery, right? We're talking about a natal female? Yes. Again, the record isn't developed, but my sense is that... Well, the policy... I'm not sure that the... Is the policy in the record? Is the policy in the record? It is, Your Honor. It's 155-1. What more needs to be developed about this? Again, what we've done is evaluate Sergeant Lange's particular circumstances and developed the record with respect to vaginoplasty and her particular procedure. All right. Well, let's go back to my question, because it pertains to the answer about the reverse sex change, that that would not be covered either. So, we have a person assigned female at birth, gets breast augmentation, gets it removed for medical necessity reasons. Okay. What if you had... Then suppose... And that's covered. That's what the policy says, in my view. All right. Then you have a transgender person who gets breast augmentation and then wants to remove the implants. That's not covered. Is that right? Again, I'm not entirely sure that it would be... Again, you're talking about a transition surgery to... Person who has transitioned, and part of that is breast augmentation. The person then wants to remove the breast surgery, reverse it, in other words, a reverse sex change. The exclusion would preclude payment for that, right? Believe so. Yes. Then don't we have the same problem where the transgender person, because of sex assigned at birth, is being treated differently under the exclusion, whether it's a reversal or whether it's a sex change surgery in the first instance? No, Your Honor. This is, again, a situation where the purpose of the surgery, whether it's sex change or whether it's reversal of a sex change, is going to apply the same to any planned participant. I also want to go back to the questions from Judge Wilson about the vaginoplasty. You mentioned that there's evidence in the record that that might be different if it's performed on a transgender person for the purpose of a sex change. That's right. Ms. Lange presented evidence that a mastectomy, say because of cancer, would be covered, but a mastectomy for an assigned at birth female would not be covered under the sex change exclusion. Is that right? First of all, is that correct? I believe that's correct. And again, the purpose of those surgeries is different. That's right. But the surgery itself, unlike the vaginoplasty, the surgery itself is the same, isn't it? The record isn't developed on the similarity of that particular procedure like it is for vaginoplasty, so I'm not sure I'm prepared to give a definitive answer medically about the similarity or dissimilarity of those particular procedures. But clearly, the purpose is different. Sergeant Lange wasn't seeking coverage for a mastectomy, correct? That's right. Send Judge Pryor's question, her earlier question, and make sure I understand. So if a natal female wishes to have breast augmentation for cosmetic reasons, that's not covered, correct? It would be excluded under the cosmetic exclusion, that's right. Okay, so a natal female could not have breast augmentation covered, and nor could a natal male under this exclusion that we're working with, correct? That's right. But then if either of them had that procedure on their own dime for their reasons, for either of those people, if they later had breast cancer and needed a mastectomy, I assume that that would be covered in both cases, correct? Exactly. And again, no one is claiming in this case that if Sergeant Lange had cancer, that she would be denied any sort of treatment. Again, this policy, this health plan does not make distinctions based on people. It makes distinctions based on medical procedures for certain purposes and certain types of medical procedures, period. But there are people who would engage in such surgeries for a particular purpose. And if you're saying that the exclusion speaks to the purpose, how does it not speak to the people? Your Honor, thank you for that question. I think what I would point you to is the Title VII case law dealing with benefits, where facial discrimination was found. So you've got the Manhart case where people had the same retirement benefit, but women had to pay more. They had to make a 15% higher contribution rate. You could envision in that situation a plan for women and a plan for men. They're different. We don't have that here. There's one plan with one set of exclusions and one set of entitlements throughout the plan in terms of what's covered. And Newport News is similar because the benefit package offered to male employees was less than the benefit plan offered to female employees in Newport News. Again, we don't have that here. If you picture the open enrollment meeting, it's not like there was a line for, if you're cisgender, come to this line and get this plan. And if you're transgender, come to this line and get this different plan. Well, I want to pick up on Judge Abudu's line of questioning. Would you agree that it would be illegal if the plan were to say that it excluded surgeries exclusive to transgendered people? If the exclusion were specific to people, we might have a different question. But I think here, because it applies to a category of procedures that are for sex change, and again, the focus being procedures, there's not a disparate treatment issue here because it's not identifying particular people. What you're saying, though, is, and to kind of pick up on my analogy, the line here is for transgender plan participants, and your plan has an exclusion in it for sex change surgery that isn't in the plan for cisgender participants. That would be a... Can I ask you something to follow up on that, which we didn't really explore at the panel stage, but I've been thinking a lot about since then, which is the plan exclusion applies to cisgender employees, and even if cisgender employees may not want a sex change operation, they may have dependents that need a sex change operation. Is it, I mean, from the perspective of the employee, one is cisgender, one is transgender, isn't the employee's sort of risk covered the same because the cisgender employee would have potential dependents that needed the operation? Exactly, yes, that's right. So it's the same package of benefits to all comers, all plan participants throughout the group covered by the county and the sheriff and the other constitutional officers. Could you tell me the county's asserted justification for the exclusion? Your Honor, in the briefing, what we articulated is the cost of the plan as a whole. So the county did not take individual procedures, individual exclusions and say, we looked at this cost or that cost. The plan is self-funded, and right now, I guess actually during discovery, it was about a $10 million a year plan. But at most, isn't it true that maybe one and a half cents more per month would be the difference if these procedures were covered? Your Honor, there's conflicting expert analysis on that issue. The plaintiff's attorney, I think, used that kind of calculation. Actually, it was much lower. It was like half a cent, but it said at most one and a half cents, right? Well, that's true, but a lot of the analysis that she was relying on related to much bigger plans like state Medicaid plans and things like that where it would average out over a much bigger population. These are billion-dollar plans as opposed to a $10 million. What did your expert believe the cost would be if these procedures were covered? The expert believed that the plan should have a set-aside for up to $300,000 based on the cost of the procedures and the risk of follow-on care. And that's just one procedure. The same point about bariatric surgery, right? Each individual participant in the plan wouldn't have to pay a lot more to cover bariatric surgery, but the plan excludes bariatric surgery because it's an expensive treatment. Exactly. But there are also more people who are interested in having bariatric surgery than in having sex change surgery, right? Well, probably. I don't know the statistics, but just speaking generally, I would imagine that to be the case. But the county is most interested— Well, in this instance, there was— Sergeant Lang was the only person identified as a transgender person who would have taken advantage of the health plan but for the exclusion. So we know that in this case, the number of people who would try to access that surgery was not even just small. It was one. Your Honor, I suspect that within the record, there was only one known transgender participant, but we don't know about dependents and we don't know about employees who may not have declared their transgender status. Let me ask one more question. Was the $60,000 verdict based on the cost of the surgery? She got the surgery, right? I don't believe that evidence was offered at trial, Your Honor. What is the basis for the $60,000 verdict? I don't know. The only information— Again, this is post-summary judgment, but the only information we provided to the jury in terms of a basis was her annual salary at that time, mid-40s. You've saved three minutes for rebuttal. Mr. Baldry. Thank you, Your Honor. May it please the Court, Barrett Baldry for the State of Alabama's amicus. In my short time, I'd like to address two issues that have already come up in the discussion so far, the first being what we might call the same-treatments fallacy, and then the second, what to do with the argument that only transgender individuals are impacted by the exclusion. Two thoughts on the same-treatments argument. One, I totally agree that the factual— that that argument fails on the facts that the surgeries are not the same. Vaginoplasty to restore function in a natal female who's undergone physical trauma is simply not the same procedure as a transitioning vaginoplasty. But wasn't the evidence that the billing codes are exactly the same, whether it's male or female, the surgeries being performed on? I don't think— Yes or no, and then you can explain. I think, yes, one of her experts did say that the billing codes were the same. Well, and the county's expert conceded that, I believe. Sure, I guess the bigger point is— Just for a question, who's billing code? Is that like the hospital or who— I think we're referring to the CPT code that a surgeon will put into the system, and then that goes to the insurance provider to determine whether this is covered or not. And those are standardized, aren't they? I think those are generally standardized, Your Honor. But that would not change the analysis here because the purpose of the treatments, the treatments themselves are very different. But isn't the county's asserted justification cost and not purpose? See, that's part of the problem. If you're—the more you stray into purpose, the more you run, in my opinion, the more you run into Bostock. Because if you're saying we're covering other sorts of similar, although not identical, procedures, and we're doing it for cisgender individuals, but we're not doing it for transgender individuals, then I think you've got a Bostock problem. Now, if the justification is cost and there's a basis in the record for a difference in cost, that's another thing. But I think you're straying into really difficult territory if you're going on the purpose of the surgery. Your Honor, I don't think cost factors into the facial analysis. It might into other parts of discrimination, but I don't think it factors into the— whether this is facially discriminatory. And I don't think we have a Bostock problem because insurers divide treatments by purpose all the time. Using morphine to treat a patient's pain, that's a very different treatment than using morphine to treat as a euthanasia drug. Same drug, totally different purposes. And here, to fit this into the Bostock, if you change the sex, the outcome does not change at all. Males cannot get penile inversion vaginoplasty. I know, but here's your problem. This is Bostock's language. Nor is it a defense for an employer to say it discriminates against both men and women on the basis of sex. This statute, Title VII, works to protect individuals for both sexes from discrimination and does so equally. So an employer who fires a woman because she is insufficiently feminine and also fires a man for being insufficiently masculine may treat men and women as groups more or less equally. But in both cases, the employer fires an individual in part because of sex. And again, I guess, to apply the simple test in Bostock, if you change the sex, here nothing changes. And to another analogy might be, imagine a... I mean, but you just said that it treated both transgender men and transgender women to use those terms summarily in the same way. Bostock doesn't give you that out. Bostock says if you change the sex and everything else is similarly situated in a different outcome result, then that is the but-for cause. That's how we know that some employees treated worse than another similarly situated employee because of their sex. Here, again, if you plug that in here, you change the sex, you change the gender identity, nothing changes because no one, male or female, transgender or not, gets sex change surgeries covered. And let me ask you this, is that because, and I'm genuinely confused about this, but is that because the exclusion likewise applies to detransitioners? Both female-to-male transitioners and female-to-male-to-female detransitioners, neither of those two can get a vaginoplasty. So beginning with female, both of them are excluded. Is that the reason that you say if you just change one thing, everything remains the same? Your Honor, I certainly think that that helps the argument, that that shows that there's not discrimination. But I think even if it were just one way, the Bostock test would still fail because no one gets the sex change procedures regardless of their sex. And that's very different than in Bostock, in which someone was discriminated against simply because of their sex or sexual orientation or transgender status. Can I ask you what your second, you said you had two points you wanted to address, and we've been talking about your first one. What's your second one? Yes, Your Honor. So what we might call the most favored nation argument or the idea that because only transgender individuals are impacted by this exclusion, that that is facial discrimination. One, I think, Lane could have brought a disparate impact claim. She did not. And I think those kinds of claims, that kind of discrimination really falls within the disparate impact analysis, but it's not facial discrimination. Is it just the name of the exclusion? I mean, it would be one thing if you just identified the procedures that no one could get, but this was described as a sex change, which again is an operation that traditionally individuals who identify as transgender get. So why decide to call it a sex change? That seems to make it more complicated for you to argue that it's not about transgender people. Two quick thoughts, Your Honor. One is, I don't think the word sex means that there's a sex-based classification going on. And... Well, what does it mean then, using sex, not for a sex-based classification, what does that mean then? Well, it just recognizes that some surgeries are dependent on sex. So for instance, it is, you know, it is true that only men can suffer from erectile dysfunction, but that does not mean that it would be a Title VII violation not to cover Viagra. Even though it would only be men who would need that treatment, women would never need that treatment. And I think the same analysis is true here. To say this a different way, if you imagine a drug whose sole purpose, whose sole use was to treat gender dysphoria and the plan excluded coverage for that drug, I don't think that would be a facial sex-based classification. Okay. To use the language from Corbett, it would not single out or disadvantage anyone because of their sex. Okay. Mr. Baldry, we've allowed you, you are answering a lot of questions from us. You've had over two and a half minutes Thank you. Ms. Grant. May it please the court. Jill Grant from Wilkie, Farr, and Gallagher. And I'm here today representing the plaintiff, Sergeant Anna Lange. This is a simple employment discrimination case. The facts of this particular case involve Sergeant Anna Lange, who is a 26-year law enforcement veteran, and she works at the Sheriff's Office in Houston County, Georgia. Sergeant Lange is a member in a health plan that's offered by her employer. And because of a facially discriminatory policy in that plan, she was denied a benefit of her employment because she is transgender. And that is a Title VII violation. And this case is completely decided by two Supreme Court cases, Bostock and Manhart. Can you, would you mind addressing, and maybe it's just a hang up of mine, but would you mind addressing the issue of what I'll call detransitioners and why it is, if the exclusion covers the female to male transitioner and likewise the female to male to female detransitioner, why that's facially discriminatory? The reversal of sex change, part of the exclusion, also requires that to administer the exclusion to determine if it applies or not, you must look at the employee's sex. But I guess the reason that I'm hung up on this is Bostock says, you know, change one thing at a time. The input is the same in both cases, natal female, natal female. Both are excluded. Same procedure. Your Honor, our argument here is that the reversal really doubles. It does not cancel out the discriminatory effect of the plan, sorry, of the exclusion. I guess just help me, like, how does it fit Bostock's simple test, change one thing at a time? Why is it that, you know, Bostock says, look, change the employee's sex and let's see if it comes out the same way. Here, the employee's sex is the same thing. They're both natal females. The exclusion applies to both. Well, Your Honor, you cannot determine if the procedure being sought is a sex change at all, whether the person changed their sex once and wants to change it again. You still have to look at whether or not what their sex was and whether it was ever changed. So is that, it's interesting, this sort of like, it feels like the way the Supreme Court has dealt with content-based speech restrictions and the Supreme Court has said, look, OK, we got out over our skis by saying if you just have to look at the substance of the speech, that's content-based. Like, that's not what we meant. But it sounds like that's sort of the move that you're making. You're saying like, no, no, no, don't see if the outcome changes by changing the input. Just see if you have to, like, look at whether someone is male or female. But I don't think that's what Bostock says. Well, I think what Bostock tells us is that sex, employment decisions that are based on someone's transgender status are, is sex discrimination. And that the way you get there is, you cannot, Bostock uses this example of an applicant checking a box. And you can't check the box of whether you're transgender or not without looking to their assigned sex at birth. And if someone wants, the exclusion- You can't, you can't check the box of whether a person is transgender without looking at their sex? That's right, because- I mean, I think they're transgender people of both natal sexes, right? So you can decide if someone is transgender by, without reference to their original sex. Well, you're only transgender if you want, if you don't identify with the sex that you are assigned at birth. Well, right, but the point is that people of both natal sexes can be transgender, right? That's correct. How does this work for the hypothetical brought up by opposing counsel, like erectile dysfunction, for example? If the exclusion was for erectile dysfunction, necessarily you have to determine if somebody is a male, or at least a natal male that, that has genital, that genitalia, because that's the only person who would apply to the erectile dysfunction. Does that necessarily mean that kind of exclusion, that it's facially discriminatory against males? Well, I think it could be, and I know this health- Well, how is it could? It either is or isn't, right? Health plans cannot withdraw coverage for a sex-based reason, right? Sure, but that gets to the intent. But if they cover lots of other things that are male coverage, prostate exams, for example, which generally affects the male side of things. That would, that's some coverage for male, but then they have this exclusion because that just happens to be really expensive, and we just can't afford that level of luxury care. How is that, how is that facially discriminatory? It would be if the plan, so I guess going back to the sexual dysfunction question, the- Well, do the erectile dysfunction, because that's the hypothetical- The erectile dysfunction question. That is sexual dysfunction, and what this plan actually precludes, and I think doesn't draw a sex-based line, is any care, whether you're a female or a male, for sexual dysfunction. But if the plan said, we cover care for female sexual dysfunction, but we don't cover care for male- I think the hypothetical, though, is not so much we cover sexual dysfunction for female, but not for male. It's more like the hypothetical says, oh, we cover sexual dysfunction for males. We just don't cover this drug, right? So let's say there are like 15 different drugs that treat erectile dysfunction, and the plan says, we exclude, you know, we don't cover like all these drugs. We cover 14 drugs for erectile dysfunction, but we don't cover the 15th. Is that discrimination against men? No, Your Honor. Okay. Well, it would depend on what the plan covered for a similarly situated female at birth, right? If you had the exact same type of drugs for a female who was suffering sexual dysfunction, and the plan was not eliminating any treatments, despite costs, costs that exceeded the 15th drug, you may have a Bostock problem. I agree with that, Your Honor. That is adding a fact, I think, to the hypothetical that was not originally presented, but I agree. Let's go back to the hypothetical. I think you had a follow-up. Well, I mean, a follow-up is just, if that's the case, if you said that's not discrimination against men to not cover every drug that treats erectile dysfunction, why isn't this exclusion not discrimination against transgender people? Because it doesn't cover every treatment for gender dysphoria. This exclusion on its face does exclude every treatment for gender dysphoria. Well, no, that's not the record. I mean, the record is that they covered the hormone therapy, they covered the psychological therapy, they covered actually consultations with surgeons. I mean, that's the record. Your Honor, I agree, Your Honor. The record does show that some of Sergeant Lange's gender transition care was covered, but the record also shows- Then that's not every. Exactly. The record also shows that lots of her transition-related care was not covered. And ultimately, what we have here is, I think that argument and that hypothetical goes to whether this is a partial violation of Title VII. And as we know, Title VII does not exempt partial violations. So that assumes the answer to the question. is whether this exclusion discriminates on the basis of sex. And you're saying, you're sort of skipping that question and saying you can't partially discriminate on the basis of sex. I completely agree with that. But I think we have to first answer the question about whether this is discrimination on the basis of sex, right? That is the threshold question. And that's what Judge Treadwell concluded based on two undisputed facts in the record, which is the exclusion denies care for only transgender employees who are members of the plan. Well, it doesn't deny care for transgender employees. It denies this coverage. So this coverage would- It also denies this coverage for dependents of cisgender employees, right? You're right, Your Honor. It's not that Sergeant Lange can't participate in the plan because she can, and that's not disputed. But the way the plan is designed with this exclusion, she cannot access all of the benefits that are offered to all of the employees because she's transgender, because she's seeking that care to treat her gender dysphoria. And it's undisputed that, but for this exclusion, this care is covered, would be covered. But that goes back to Judge Newsom's question. You said this exclusion only affects individuals who are transgender. But if you have somebody who has, is born a man, has the surgery, the bottom surgery and the top surgery, and then no longer identifies as transgender and wants to go back and have sex change surgery, the exclusion would apply to someone who is not transgender, right? Your Honor, I don't know how, how to identify that person at that point if they're not transgender anymore, but they were at one point. And it's, the exclusion prohibits any care related to changing sex. But transgenders are self-identifying. They're saying, I'm transgender, so why can't somebody who's had all the surgery say, I'm no longer transgender. I'm going to detransition. And that is someone who is not transgender. So isn't this sex surgery exclusion affecting people who are not transgender too? Applying the reversal piece of the exclusion under that example, yes, would apply to someone who at that moment in time is not, but they were. And what the, the plan can't even decide when if someone who's no longer transgender, in your example, goes to their doctor and says, I want to detransition, I want healthcare. And they submit the claim to the, to Anthem, who's the administrator here. Anthem cannot decide whether or not to apply the exclusion without looking to that person's sex. Sure they can, because the person in both instances, the person who is transgender who wants surgery, and the person who is no longer transgender who wants surgery walks in and says, I want a sex change. Exclusion applies. And the same, it applies also, if they are asking for the reversal of the sex changes. Correct. The word sex change is still being applied. But all they're having to look at is the simple test of Bostock is change one thing. Here we have a transgender person who wants sex change surgery, and a non-transgender person who wants sex change surgery. And the exclusion applies in both cases. How do you not fail Bostock? Well, even if that particular example doesn't fail Bostock, the rest of the exclusion does. And it does fail when it's being applied to Sergeant Lane. Part of the premise of where you started was that it's the same thing that is denied to one person and allowed for another. And so that's the discrimination. As I understand it, though, and I think the state and the county has argued this, what we're talking about, the different surgeries are actually quite different for someone who is seeking a sex change surgery for one purpose and seeking a sex change surgery or the same kind of surgery for another. I think the questioning regarding vaginoplasty on the one hand, and then a sex change surgery on the other, those are just not the same thing. And so are we talking about apples and apples, or are these apples and oranges? Well, in the eyes of the health plan, they're apples and apples. Is that just because of the CPT codes? Because it sounds like there was expert testimony that, on both sides, that seemed to suggest that there were things different about it, even taking the plaintiff's expert, as I understand it. The record in this case, we have Dr. Schechter, who was our expert, who talks about that there are many different reasons and actually many different surgical techniques that apply when an individual who's assigned female at birth needs a vaginoplasty. So to make the distinction based on surgical technique really doesn't advance the position of the county and sheriff's office in this case. Because no matter what, when an individual, whether they're assigned female or male sex at birth, when they seek a procedure that the plan considers to be changing their sex, it will be denied based on sex. Sergeant Lange went to New York to find, excuse me, the preferred surgeon for this procedure, correct? I'm sorry. Sergeant Lange went to New York to find the preferred surgeon for this procedure, correct? That's correct. And wasn't that because there's no one in Georgia who's capable of doing that work? I'm not sure that... I don't remember if that's exactly what it says, but Dr. Bluban Langer is one of the top. I believe that that's what the record reflects. I'm sure counsel on the other side can tell us if I'm wrong. But do you know if there are surgeons in Georgia, I assume, who can perform a vaginoplasty on natal females for these other purposes? I would assume that every woman who needs that doesn't need to go to New York, right? Doesn't that suggest that these are very different surgeries if there's not anyone in a pretty large and sophisticated state who can even perform the procedure effectively? I wouldn't agree with that, Your Honor. I think that the question here that matters is not is the surgical technique different, but what matters is in the eyes of the man... Why doesn't that matter if it's really an entirely different surgery? Well, I don't believe that the record does support that it's an entirely different surgery. Do natal women have their penis and testicles removed when they have this surgery? No, Your Honor. That seems pretty different to me. Well, that's precisely why this is a sex-based line, because in order to determine whether it's covered or not, you have to look at whether these genitals are present, and that's what is part of what makes it an exclusion that's based on sex. Let's go back for a moment to the issue of the 15 drugs for erectile dysfunction. Erectile dysfunction is a specific kind of problem. If there are 15 different ways that can cure it in exactly the same way, isn't that different from a situation where you might provide certain types of treatments for transgender individuals, but you provide zero kinds of treatments whatsoever as far as so-called sex changes? I agree with that, Your Honor. And I think that hypothetical goes to cost, and it's not disputed that health... Well, it makes an assumption that I don't think was part of the earlier hypothetical, and the assumption is that all of the drugs deal with it equally, but I don't think that's necessarily what the hypothetical was based on. It might well be that the one that is excluded is the one that's most expensive and works best. Well, I'm... And you would agree the plan can exclude that, right? For cost. The plan can exclude surgery for cost? No, it can exclude that more expensive, but best working drug. I would agree that... But isn't that different, right? Isn't that different? Because at least in that scenario, there's some treatment that is being provided. I hate to get technical, but when we're talking about erectile dysfunction, we're talking about a male's inability to have an erection for purposes of intercourse. And so if you have 14 drugs that treat that and allow a male to have an erection for purposes of sexual intercourse, and the 15th one does it better, but... Is more expensive. Is more expensive. Isn't that different than a situation where there is no treatment available whatsoever to a person who is transgender who wishes to have a so-called sex change operation? In other words, isn't it a very different kind of thing to treat or... You're not addressing the same exact problem when you're talking about things like counseling. And even though those are important things, no doubt, isn't that a different kind of situation? You don't have a cumulative or redundant type of treatment available. I agree, Your Honor. I think the example, the drug example for erectile dysfunction... How is it any different from the hormone replacement therapy is for the same problem, but it's less expensive than the surgery, which is also for the same problem. One of them works a lot better and is really more sought after, but one's more expensive than the other. So a couple things there. The first is, it's not disputed that the exclusion withdraws healthcare to transgender members. And that is a sex-based line. And you violate Title VII when you draw sex-based lines. And Manhart has told us that cost is not a defense in that when you're doing that. Can I ask you a question, though, getting back to that for one moment? At the end of receiving one of the 14 drugs that's covered, does a man... Then a man will then be able to have an erection that allows him to have sexual intercourse. But at the end of a treatment of hormone therapy, will a transgender woman have a vagina? No, Your Honor. Right? So isn't that entirely different? I agree with you that these are not... How does that distinction make a difference to the question we're addressing here, which is whether the exclusion is based on sex? That's the question here, is whether this exclusion is based on sex. And I'm trying to... The success or failure of the treatment and how good the treatment is and all that kind of stuff doesn't seem to go to the issue that we're talking about here, which is whether the exclusion on its face is based on sex. And I think you agreed with me that if all the exclusion says is we don't cover XYZ drug, and that drug is a treatment for some male condition, right? I mean, whatever it is. Could be erectile dysfunction, could be prostate cancer, whatever it is. We don't cover this drug. I think you agree with me that that's not a sex-based distinction. Am I wrong about that? Well, I think there are a lot of facts that we talked about with that hypothetical and assuming those still apply there, then yes, but it is not the same as the exclusion that's applicable in this case, because on the face of the exclusion, it prohibits all care for all plan members who are transgender who want that health care to change their sex. Well, okay, I'm sorry. You said all care, but you meant just the sex change operation. Any care to treat gender dysphoria. Any care that's inconsistent with the record. No, well, that's inconsistent with the record.  and they have psychological therapy. There's all kinds of care that was provided to your client that was related to gender dysphoria. That's just not, that's false. That's a misstatement of the record. Well, I would respectfully disagree, Your Honor. I do agree that the record shows that some care was covered, but just because... Hormone replacement therapy, for example. Lots of care, not just the surgery, was also denied. And we... But there was some care provided. Notwithstanding the exclusion. You can't say that it excludes everything. That, I mean, you have to admit, you have to concede that there was some care that was provided. The goal here, though, is a sex change operation. And all of the medication or prescriptions that get you there don't get you over the line. And that's what we're focused on, the actual operation that gets you over the line, not the medications that help you in that process. Correct? Well, I'll answer both of those comments and questions with one answer, which is, although sometimes the exclusion was not applied to some of Sergeant Lange's care, the defendants in this case admitted that it should have. It was meant to. It should have excluded mental health counseling for gender dysphoria. It should have excluded hormone therapy for gender dysphoria. And so, as we all know, sometimes health insurance companies might make clerical mistakes or there might be things that slip through the cracks when they're covered. But that's not really relevant to whether this exclusion in this health plan discriminates because of sex.  I have one more question, Chief. I want to go back to something that Mr. Boudry argued. He said, per Bostock, that if you change the sex here, it doesn't change the decision. But if Sergeant Lange had been assigned female at birth, the surgery would have been allowed. So it makes all the difference. Isn't that right? I agree with that, yes. OK, Mr. Lale. Thank you, Your Honor. Thank you. I'd like to address three points in rebuttal. First, the plan did cover Lange's non-surgical care and the endocrinologist actually coded that with diagnosis codes that reflect that it was specifically Is it true that your adversary says, though, that your side basically said it shouldn't have been covered, even though it was provided that was a mistake, we shouldn't have done it. Is that true? In the record, I think she's referring to fact 77, where it said exclusion denies coverage of procedures otherwise covered. And that's exactly what exclusions do. It takes coverage that might have been covered as medically necessary and says, we're not going to cover that. So, yes, we admitted that fact, but we qualified it by saying that it does not exclude all transition coverage. And the endocrinologist care, the psychologist care, the hormones were all covered. And the endocrinologist used codes like Z87.890, which is for personal history of sex reassignment, and F64.1. So your position is that wasn't a mistake that was covered, and that's the reason it was paid? Right. The exclusion applies to sex change surgery or the reversal of sex change surgery. And so that applied in... It was handled the way it was supposed to have been handled by Anthem. All the care that she was provided, did you have to determine what her sex was at birth in order to determine whether or not she was entitled to that care? The care that was covered? Yes, because based on these diagnosis codes, it's clear that the care was being provided because she was transitioning from one sex to the other. So that the endocrinologist care, the hormone care as a male, she's taking female hormones and male hormone blockers. So it was clear from the record what was going on in terms of that various care. Can I ask you a question about this? So I think I don't quite understand. I still don't think I quite understand why it is that simply taking cognizance of someone's sex at birth renders something a but for a cause. If in fact this applies to transitioners, female to male transitioners, and likewise, female to male to female detransitioners, taking cognizance of the fact that both of those individuals were female at birth, I don't think I understand why that renders it causal. Maybe I'm just missing something. No, I don't think you are, Your Honor. I think the way this plan works, and I think to build on your question, what Vostok says is it prohibits discrimination simply for being transgender and presents a standard of changing one thing at a time to identify discrimination. And Vostok used a biological distinctions basis of sex. So if we change somebody's biology from natal male to natal female and ask would that change result in the sex change surgery being covered, the answer is no. So this case does fail the Vostok test in the sense that Vostok does not identify discrimination by changing one thing, the Vostok analogy. Your time's got you, Mr. Lael. Thank you. We're going to take a brief recess. All rise. We may.